Case number 23-5220, Cigar Association of America et al. v. United States Food and Drug Administration et al. for the balance. Ms. Powell for the balance, Mr. Ebney for the evidence. Good morning, your honors. May it please the court. Lindsay Powell for the government. I'd like to reserve three minutes for rebuttal. As part of its public health analysis, FDA expressly acknowledged in this rule that patterns of less frequent cigar use result in less risk for many users, and it explained why regulation was nevertheless warranted. I want to be clear in what the rule says about this. So if you look at page 2920 of the Federal Register in the final rule, it says, Cigar smokers generally smoke at a lower frequency and tend not to inhale the smoke, thus reducing but not eliminating their exposure to its toxic substances. That's what plaintiffs say that the agency failed to consider. And it is right there in the rule, not just in this reference, but also others. And it's an observation made with respect to premium cigars in particular. The district court... Could you elaborate on that? How is that an observation about premium cigars? Because from what I reviewed, it seemed that there were a lot of general statements about cigar use, but there's a subset of cigars, which are premium cigars, which have an even different pattern of use, which is even less frequent. So two things, Your Honor. One, as FDA also notes on page 2920, there is sort of some trickiness with the terminology. Premium cigars are not a widely acknowledged class of cigars. They're not defined that way. And in the scientific literature, the studies aren't broken out that way. So as FDA notes, again, at page 2920... In the Quarry study, they are broken out that way. But not in the Monograph 9 study, for example. But if I may... You have to address the Quarry study. So the point that I was making about FDA acknowledging infrequent use with premium cigars is where it makes statements, for example, at 2920, that some premium cigar smokers might smoke such products infrequently, does not negate the adverse health effects, or show that cigars do not cause secondhand smoke-related disease. So the point here is this is not a rule, where FDA is saying there are no patterns of infrequent use, or that patterns of infrequent use don't have an effect on the resulting rate of disease. Those statements were already in the NPRM. And nonetheless, the agency said, we would like to know about relative harm for premium cigars, your terminology, and asked for data on that, and asked about the term relative to other forms of tobacco intake, and asked, should some different regulatory measures be adopted? So it wasn't all or nothing. And so it was an inquiry using the premium cigar language. So we can't beg off that there's no definition on that. And looking for relative information, relative comparisons for premium cigars and other things as to health issues and to regulatory need and regulatory measures. So I don't understand how those general statements are responsive to what the FDA expressly put on the table. So again, in terms of what data was then available in the final rule, I want to be that FDA did not adequately consider. One of them is monograph nine, and that's not specific to premium cigars. That's also noted in the notice of proposed rulemaking. It's expressly acknowledged by FDA at page 2924. So again, this is not something the agency overlooked. It's right there. It's acknowledged, not specific to premium cigars. The query study is specific to premium cigars. And again, the agency did discuss it for the very significant point that a full third, over a third of premium cigar users also smoke cigarettes, which underscores the complexity of these tobacco use issues and the attendant public health consequences. It is true that FDA did not cite the particular query study finding, did not spell it out, that only about three and a half percent of premium cigar smokers use these products on a daily basis. But it doesn't follow that FDA overlooked that frequency of use issue. It says, we know that these products are often used less frequently and that infrequent use entails less risk. That's the fundamental public health point. There's an analysis of, which the NPRM also asked for, of what the implications of that markedly less frequent use are for appropriate regulation, and combine that with the evidence of these products not being marketed to youth. So you should ask for, should there be adjustments to the regulatory regime? And then instead they were just shoved in, including all these advertising restrictions that are aimed at protecting youth that are just not relevant on the record, or haven't been shown to be relevant on this record to premium cigars. Well, several points in response, Your Honor. One is just briefly taking a step back. This is quite broad tobacco product regulation and premium cigars are not the only products that are used infrequently that are thought to... What is a premium cigar? That's a great question, Your Honor. It is not defined at federal law. It is not a clearly defined category, which is one of the reasons we're having so much trouble implementing this user fee scheme on remand. But in general, it is a larger cigar that is made solely of tobacco. There's a seven part definition that the district court set forth for purposes of this case. But the products like hookahs and pipe tobacco are also used infrequently by many users. There was a definition in a notice of proposed rulemaking. What is that definition? I have that here. I don't think, apart from the administration of the user fee scheme, I don't think a lot turns on this definition. But in the notice of proposed rulemaking, it's wrapped in whole leaf, whole tobacco leaf contains 100% leaf tobacco binder, contains primarily long filler tobacco, is made by combining manually the wrapper filler and binder, has no filter tip or non-tobacco mouthpiece, and is kept by hand, has a retail price of no less than $10 per cigar. That term is not in the district court's definition. Inflation adjusted. Inflation adjusted, does not have a characterizing flavor other than tobacco. The $10, Judge Mehta did not put that in his definition. Correct, Your Honor. Correct. So what about the statements about there being no data, no data provided to support the premise that there are different patterns of use of premium cigars? Yes, Your Honor. There's four different statements to that effect, but there was data. It was the Corey study. So these statements need to be considered in context and also, I think, parsed very specifically. So there are five of these statements in total. Two of them, if you look at them on their own, it does make it sound like perhaps there was no evidence in here at all about patterns of use or the effect that infrequent use has on harm. But as I've been talking about, we know that's not true because FDA says over and over again, we know that less frequent use decreases risk. We know more frequent use increases risk. That's right there. This wasn't a mystery. It wasn't a secret. It wasn't something the agency overlooked. And it also acknowledged that many cigar smokers, including premium cigar smokers, are smoking less frequently. And so you have to take these statements in that context when you're trying to figure out, did the agency actually overlook part of the problem? Three of these statements say something a little different. They don't say there was no data about patterns of use or the harms of infrequent use. They say that there wasn't data to support the conclusion that these patterns avoid the risk of disease and addiction. In premium cigar smokers, and that's a that's a very different thing that really gets to part of the core of this public health inquiry is what what are the other risks that we're worried about? There's the risk of you combine the Corey study and monograph nine. Isn't that evidence that there is no public health problem with premium cigars, or at least there's data to that effect? I'm not saying that that's true, but the Corey study says it's very, very infrequent. Only three percent do it daily, and most people do it very infrequently. And then the monograph nine says, if you smoke one to two a day, I'm surprised this is true. There's no health impact for people who don't smoke at all. So that's data that there's no health impact based on smoking premium cigars. The agency said there's no data. So that's not what monograph nine says. There is a finding based in all likelihood on the extremely small sample size that the findings of the increase in all-cause mortality were not statistically significant. That's not the same as a finding that one to two daily cigars are safe by any means. The same study also finds that... It's a good explanation, but I didn't see that in the final rule. The same study also finds that the risk of aortic aneurysm is about doubled on that same frequency of use. And backing up to the sort of introductory statements... No, but is all the stuff you just said, including statistically insignificant sample, was that in the final rules explanation? It's not in the final rules explanation. And again, this is in the course of a much broader rulemaking where it's... I mean, the standard that we bring to these agencies' decisions is not an impeccable explanation of each of these points. Did it consider that less frequent use of these products might reduce risk? So if we think that that's not adequate, a general statement that less frequent use reduces risk, if we think that based on this case, given what the NPRM said, the focus on premium cigars, that subset, if we think that that's inadequate, then you lose. Because you're relying only on the fact that general statements about cigar use and less use is adequate. If we don't agree with you, you lose, right? No, Your Honor. So the point I've been focusing on is trying to underscore that this was not... The agency emphatically didn't overlook this question of infrequent use, but it also abundantly explained why a number of considerations in conjunction with this frequency consideration warrant regulation. And it's important to recall that the deeming rule is an on-off switch. If premium cigars are carved out from regulation, they are not subject to any of these FDA authorities, any of these provisions. You can then have people handing out free samples and putting them in vending machines, and the federal minimum age of sale rules don't apply. It's a fundamental question about regulation. Right. Your NPRM asked about, should there be adjustments to the regulatory scheme given... You asked for information about different risks and it's shown, should there be adjustments to the regulatory scheme? Is there something in the law that would prevent the FDA from saying, hypothetically, premium cigars, okay, they don't need to have these... You're not so worried about the marketing to youth because by definition, they're not flavored and they aren't sold in a way that's marketed to youth, but we're still concerned about health risks. And so we will have a modified regulatory regime as to them. Is there anything in the law that prevents the FDA from doing that? The way Congress wrote the Tobacco Control Act, there are certain provisions that apply or do not based on operation of the deeming decision. And again, none of them apply if they aren't deemed. So that deeming decision, which is all that's at issue here, should they be deemed is the threshold inquiry for any of it to apply. There is then some room for FDA to make product by product considerations. But in addition to frequency here... But it just seems to me that the things that you're saying we should be worried about probably are not really worrisome. Nobody's handing out $10 cigars as samples. They're not selling premium cigars at a vending machine. Because it's been illegal to do so until now. If you make these products, the only products that are not regulated... They're luxury products. You think that there are people who want to sell... Some of these cigars are really expensive. People want to buy them from a vending machine? FDA predicted that if these products are singled out from regulation, that they are the only of things will happen. Patterns of use will change. People will get the message that these products are relatively safe, which they are not. These are inherently dangerous products. They cause laryngeal, pharyngeal, oral, esophageal, stomach cancer. They cause aneurysm. They cause heart disease. What stops the FDA from saying... You did a whole other ANPRM in 2018 to collect more information. I'm saying, from looking at that, either reopening this record or using that new one, however you want to do it, collecting information again, making a judgment again about regulation, dealing with the data, and making a decision that wrestles with the data that's provided, and making a regulatory decision that deals with whatever bad problems emerge in this period, or have emerged maybe already, since the rule has been vacated. By the way, in the process defining premium cigar, however you all think is appropriate based on the record. When FDA withdrew the ANPRM from the unified agenda in 2021, it explained, based on the evidence available at that point, that its decision to regulate, that the decision to deem was amply supported by the evidence available, and it expressly acknowledged... That has now been overturned by the district court. You haven't done a new rulemaking based on that. No, but this is reflecting FDA's thinking about the then current evidence as of 2021, so just a couple of years ago. So go forward and make... The problem here wasn't that the district court found you lacked statutory authority to regulate premium cigars. It was a breakdown in the rulemaking process. We have your arguments about that. I'm just assuming if those aren't accepted, you're talking about all these harms, and it's an in or out thing, but it's not permanent, is it? There's nothing that stops you from doing the rulemaking again in a way that would be consistent with what the district court's concerns were. That's absolutely true, and if the court were to remand without vacating, it would be all easier. This FDA absolutely can further explain this if needed, but the explanation really is there, and in addition to... If you remand without vacating, you can't consider the information you gathered from the 2018 process or later judgment? Correct, but as FDA explained in 2021, the information doesn't change its view. It was aware of infrequency then. It's aware of infrequency now, but I do want to... You guys can fix the problems, right? You guys can deal with this going forward. It's just a question of what the judgment is that needs to be done. It's a question about what process would be required for it, but I do want to be clear that these are incredibly dangerous products. A single one of these large cigars contains the same tobacco. Wasn't that the question you were supposed to answer? Are these dangerous products? Maybe they're not because of their patterns of use. Your argument assumes the answer to the question you were supposed to answer that you didn't answer. Well, in the final rule though, and FDA does answer it, it explains why these are dangerous products. And so if you have a product... But if based on the patterns of use, people use them very, very infrequently, they don't have the same dangers. That was the whole question that has not been answered. So I don't think you can rely on that answer and assume that it's true. FDA acknowledged in the rule that people who use these products less are exposed to less harm. That is in there. That was part of what it considered. It doesn't cite the core study number, but it considered that. It also considered... Right, right. But I'm just saying that I don't think you can sit here and argue relying on the fact that these are incredibly dangerous. That's not... That's too simplistic given the record here. Do you want to move on to the vacator versus no vacator? One more stab at this if it's okay, because this is in the final rule and it is much of what justifies FDA's decision. So it's not just I'm saying these are dangerous. I just think it's a circular argument because the question is whether that's supported. The question is whether you took into account all the data. The question is... So I don't think you can stand on that. I mean, there's what FDA took into account, which includes that these are the equivalent of an entire pack of cigarettes, that by the core study's own information, you have over 120,000 people smoking them every day, that you have secondhand smoke exposures, which are how much I'm exposed to is not affected by other people's frequency of smoking. If I'm working in an establishment where people... But everything that you're saying is not in the rule. That is in the rule. These things are in the rule. The fact that this is equivalent to a pack a day and that... No, but it didn't account for what's in the core study that you just relied on. The one thing that is not expressly spelled out in the rule is that the 3% figure and that... I'm just saying that you were just relying on that. And the ancillary point. Well, you did ask about relative harm. I think that's what Judge Pant is referencing here. And that spoke to relative harm in the final rule. And I'm... To get to the... We're over time. To get to, I think, your remedy questions, and Judge Randolph had alluded to that as well. You've made arguments about the definition of premium cigar objecting to the district court's definition, but you didn't raise that before the district court. So how could we consider it now? We... As part of our broader objection to vacater of the decision explained the difficulty of implementing the definition in the context of this user fee scheme. And it was very much an open regulatory question in the final rule. It's a fairly extraordinary thing to judicially define this category of products when that definition doesn't come from... He used an FDA definition. From another context and not the one in the proposed rule. And it's... Would have been a great argument to present to the district court. I'm just trying to struggle with the rationale for us being able to entertain that argument. I understand the concerns about it. He didn't pick the one from the NPRM. I don't know why. But... And it's your wheelhouse to define one would think. But he wasn't overreaching in the sense that he made up his own. He picked an FDA definition and got no objections on that ground from the FDA. So I'm just not sure what we can do about it at this stage. There are the broader concerns about vacater with any of these definitions. This is a zero-sum user fee scheme that is proving extremely hard to administer and untangle the definitions that Congress provided when it expressly contemplated that cigars... All cigars. There's no carve out for premium cigars. Again, that's not something defined at federal law. But it would be tied to excise tax data that doesn't... It can't be parsed this way. And so FDA now has over 175 pending fee disputes that it has to consider individually. And so this, if you look at... Pretty good reason to hurry up and do your rulemaking on premium cigars. I know rulemaking on premium cigars. Indeed, the rule was only vacated a year ago. The clock has not been ticking for all that long. And again, we do think it was not a fair characterization of the rulemaking to say that FDA didn't consider... We're reviewing for abusive discretion and vacater is the default remedy. And the other side says that there are no precedents reversing a district court for granting this default remedy of vacater. Are you aware of any precedents where we reversed under those circumstances? No, but it clearly is an option if you look at Standing Rock, for example, when the court... It's an option, but it's an abusive discretion standard. So even if both options are reasonable, we can't reverse them if this one is. Sorry, I mean that under the abusive discretion standard, it is an option to conclude that it was an abusive discretion. It's not... Of course it is. Yes. So I am not aware of an example, but the way the court engages the analysis, it is certainly available for the court to find that. And this is the quintessential case where a number of things make clear that FDA would reach the same conclusion if given the opportunity to explain more. There are all sorts of other products that in one way or another present less risk. Why is it clear given that there's ongoing rulemaking going on to examine this issue? Why is it clear? There is an ongoing rulemaking. The FDA has withdrawn the ANPRM from the regulatory notice. It's not ongoing. It has said that the current evidence supports the decision made. But there's also this broader context where you have e-cigarettes that present less risk, that may present a public health benefit. You have hookahs that are used less frequently. You have pipe tobacco used less frequently. And FDA deemed them all. It is clear that in this broader public health inquiry, which absolutely applies to cigars, it's not just a question, does less frequent use decrease risk? There can be decreased risk and still an ample basis for regulation. And FDA explained that ample basis here were explained in very specific ways. The harms of these products, the way premium cigar users, again, over a third of them are also smoking cigarettes, which dramatically increases their risk of harm and demonstrates the complexity of this issue. People are misled about the safety of cigars. No one's asking for refunds past fees paid, correct? This is all prospective? That's unclear. That's unclear whether they will be. You've got these disputes. Has anyone asked for refunds? So the disputes have to do with figuring out these. Has anyone asked for refunds? Essentially, yes. What we haven't gotten into is whether past year refunds would be on the table. That's what I meant. Yeah. So with the current disputes, that is absolutely they are asking. Their FDA sends in the quarterly amount and they say, we don't think we owe this amount. And so then there's a dispute about what amount they should be able to pay. Or withholding the amount while it's being considered case by case. That's very different from what I'm trying to ask is, is anyone asking for a refund of fees that were paid before the district court's vacature order? They have not, but I'm not sure that's a closed question. I'm not, I'm not sure whether. I assume the FDA's position would be. Well, yes. Because that would be a very different type of district court order if it were to, if the vacature were read to do that, that would be something very different. One could certainly ask the district court for clarification, I suppose. But that would be an extraordinary exercise of the district court's power that our president has said would be cutting or could very well be cutting into abuse of discretion. So we shouldn't read it to do that. I agree, Your Honor. It is just not entirely clear to me how others might read it. Thank you very much. We'll give you some time for rebuttal. Thank you, Your Honors. May it please the court. My name is Michael Edney, and I'm here on behalf of the premium cigar manufacturers, retailers, and consumers. Judge Maida correctly held that the FDA's decision to regulate premium cigars was arbitrary and capricious. And I want to jump directly into the questions that the court was asking of opposing counsel in this matter. The issue here is a finding regarding the specific differences between premium cigars and other cigars. And that's something that is entirely absent from the final rule. And to the extent it was made, it was made erroneously. There are two key conclusions on this point. One's at 29,020, and this is the conclusion that there was no data presented of different patterns of use of premium cigars, and that those patterns result in lower health risks. And the next one's at 29,022. That's where the FDA— One at a time. So on that one, they backed up that there's not lower health risks. Maybe different health risks, but it's not lower. They backed that up. They said the data shows that there are these risks. They still have terrible risks of cancer in the mouth and laryngeal, maybe less in the  But so that part of it was addressed in the final. No, Your Honor, I don't believe that's right. The FDA at that passage, at 29,022, is— Sorry, I thought you said 020. 020, I'm sorry, is having a discussion regarding the surgeon—and this also happens at 022—is having a discussion regarding the Surgeon General's report. And the Surgeon General is saying, look, cigars have lesser health effects than cigarettes because they are smoked less frequently and there's some suggestion of lack of inhalation. That's a comparison— They're not generally inhaled. That's right. But on 29,020, they say there's no data as discussed in section—sorry, is that 7C? That's right. 7C lays it out more and gives all the context to that no data statement. Right, right. I think it does. And then I would direct the court to 29,022. This is the next specific statement on this. Well, there's one more in that same column, which I think was the other one you referenced. Which doesn't have the cross-reference to 7C, moreover, there were no data provided to support the premise that there are different patterns of use and that these patterns result in lower health risks. That's right. I was just responding to the second half of that, that they result in lower health risks. Right. They addressed that and said, here's what our data shows about the health risks of these. Well— So it's really only the patterns of use part that's— But this addressing that's going on regards the difference between cigars and cigarettes, not between regular cigars and premium cigars. And I think the key context is at 29,022. Well, why is that? Their NPRM is saying, look, here's the things we're already—cigarettes being the big one. And we're interested in knowing about how these risks compare to things that we are already regulating, not just to cigars, to the health risks, to the things that we are already regulating. So it seems perfectly legitimate in Section 7C to have made those types of comparisons. And we don't fly spec agency explanations. Right. They've said, look, here's why we're going with option one, danger, danger, danger. Harmful, harmful, harmful. And the data that they talk about, they talk about a lot of data, not the stuff that you want them to do, but they talk about a lot of data and a lot of studies and say, the health risk is still substantial and warrants regulation. And so why is it that those explanations for why we're going with option one do not implicitly answer the question of why we're not going with option two? The—I would put it in a different way. If we go back to the proposed rule, the—there were premises of the proposed rule that were beyond dispute. We are going to regulate cigars, most cigars, right? That—nobody was contending to the contrary. We— There were no challenges to that. There was no challenges to that. There were really no commenters asking mass-produced cigars to be excluded from regulation. That wasn't on the table at all. It was the FDA that set up this option two. Option two was we're going to define the category of premium cigars because perhaps they're used in different ways and those different ways have lower health risks than other cigars, not the cigarettes, than other cigars. Well, they want to know if they have lower health risks. That's right. That's right. And then when we get to the final rule, what the FDA is saying is, look, cigars in general have health risks. That's what we knew when we proposed the rule. We gave these guys, we gave all these participants in the marketplace an opportunity to come to us with some real hard data about the specific patterns of use of premium cigars. And then they say nobody showed up, right? Nobody showed up with premium cigar-specific data. It's just one big, giant ball here. And I think that's where the FDA really drives it home at 29,022. I think when you read the final rule, what they're saying is, here's a bunch of data that shows there are still material health risks, significant health risks, even with premium cigars that warrant regulation. Your Honor, I think the reason why they reached that conclusion is because of what they said at 29,022, is that we asked commenters to come up with premium cigar-specific data regarding their patterns of use. And no such data was presented that showed that they had lower health risks. What they're saying is, what we got was a bunch of assertions about how premium cigars were used. We found no lower health risk. It's a different health risk. It may show up in different parts of the body, but there's still health risk there from smoking cigars. It may not be the all-mortality one, but it is mouth, laryngeal, esophageal cancers. The FDA found health risks with regard to cigars in general. And they found it in the proposed rule, and it was really beyond dispute, and in the final rule, when they explained why they were finding no lower health risk with regard to premium cigars, and therefore no need to explore the situation of whether a different regulatory scheme is appropriate for them, they said that whereas no data presented that premium cigars have different patterns of use that result in lower health effects, what they were saying is, look, all we got is a bunch of studies about cigars, and we didn't get anything serious about premium cigars. That is not true, though. The record did have an FDA-sponsored study. That's quite what they said, and they did talk about it. I guess what I'm trying to ask is, which study showed that they were wrong to think that there are risks? It may be a small portion of the population, but there are still substantial risks of cigar-specific cancers for premium cigars. The FDA never made that conclusion specifically with regard to premium cigars because it said the reason for its conclusion regarding premium cigars is that there was no data presented of different patterns of use between premium cigars and other cigars and the attendant lower health risks of those different patterns. Everything turns on the health risk. They wouldn't care about the pattern of use unless the pattern of use reduced health risk or marketing to children, which I don't think they dispute is not an issue. The notice of proposed rulemaking recognized that all cigar smoking is potentially harmful. I thought the rulemaking was to determine whether there was a significant difference between regular cigars and premium cigars. The FDA said we have no data on it, but in fact, they did. That's exactly right, Your Honor. I think Judge Beda explained this very well. We need to consider the final rule in the context of what was said in the proposed rule. I understand that, but what I'm trying to—and if I've just missed this on the record, please tell me—I recall the evidence that was submitted about all mortality risk for premium cigars being—I think there was no difference for the norm of premium cigar users, the ones who don't use it regularly, as to all mortality risk as compared to non-smokers. Is that correct? Am I remembering that correctly? As to all mortality risk, premium cigars, the vast majority, the 97 percent who use it, infrequently, there is no increase in all mortality risk.  So the evidence in the record under monograph nine is for those who use two or fewer cigars per day, there's no evidence of a statistically significant increase in all mortality risk. No, that's all mortality risk. But what they cite in the final rule is specific types of cancer that cigars have a particularly increased prospect of causing. Was there a study that you guys submitted that said that may be for your run-of-the-mill cigars, but premium cigars do not cause those cancers or have a—not do not, that might be too hard to show, but are not associated with that higher risk of those specific mouth, esophageal, whatever other parts of the body are here, sort of the neck and above cancers? Your Honor, I think what you see in the proposed in the final rule where it discusses monograph nine and other studies is that cigars in general can cause these other cancers. What you don't see anything of— I'm asking you what your clients or others put in to show that premium cigars are different than regular cigars when it comes to those specific forms of cancer, all mortality risk. And what we put in is at JA 529, this is the Cigar Rights of America comment that says, when you look at premium cigars, our consumers especially, in particular, 97% of them are using the product less than daily. And remember, the threshold for all-cause mortality is fewer than two cigars per day. So even the smaller— Fewer than two or fewer. Two or fewer, that's right. Two or fewer, Your Honor. Exactly right. This might be my confusion. Yes. Okay. As to what all-cause mortality means. I had thought all-cause mortality was all tobacco-related mortality. But then within that would be a subset of the particular cancers, a sub-mortality set of the particular cancers associated with cigars. And that's what my question is about. I give you that you guys put in the information or somebody put in the information about the comparison of all-mortality risk. I'm asking about this subset of cigar-peculiar cancers, whether mortal or quite disabling. All right. And to answer that question, I will direct the court to Judge Mada's answer to that question at J26-28, and I'll try to re-provide that answer myself. I think what we're getting confused about here a little bit is that— I'm getting confused. No, you're not. No, no, no. It is confusing, right? And I think that's one of the problems with the final rule. It shouldn't be confusing. We should have a clear explanation. But what opposing counsel said below is, hey, listen, even with regard to this cohort of that use two or fewer cigars per day, it's not just all-course mortality. There's these other bad things that can happen even to them. They have slightly elevated risks, right? That analysis is absolutely nowhere in the final rule. Nowhere, right? And I think Judge Mada marched through this and said that's a convenient post-hoc explanation about saying premium cigar consumers, 97 percent of them at least— I'm asking, was there evidence in the record that showed that as to those concerns that are definitely flagged in the final rule for cigars, as to premium cigars, there's evidence they do not contribute or do not contribute at the same level as other cigars or other tobacco products to those specific cancers? That's the narrow question I'm asking. Your Honor, we need to take the FDA seriously in what they said. No, I'm asking you what you all said. I'm asking whether they ignored that particular information or your concern on health risks is that they ignored the study about all mortality risks. Yes, they ignored that. And they did not say that—what they didn't say is for these infrequent users, whatever increased risks there are of these other health side effects, those are important enough and significant enough to justify this massive regulatory scheme. They didn't say that, right? What they said in the final rule was cigars cause these other types of health effects. But what they didn't analyze, what the FDA didn't analyze in the final rule is for these two and fewer cigar-per-day folks, you know, is the increase of these other health effects, is that enough to justify the regulation? And that's an analysis that came post hoc in the district court. That's not ignoring data. That's just a gap in explanation. What you're talking about now is they didn't make that separate sentence. That's not what Judge Mehta was relying on at all. Well, no, I think— That's not those no data— No, I think he was relying on the lack of that explanation. But I think he was— His decision and certainly his vacature decision was very much based on, and what you all were pressing hard, and I understand why, were these no data comments, not just one gap. And it could easily be discerned from the final rule. They just didn't spell out one more sentence that here's this terrible risk from cigars, here's the terrible health consequences, and it is bad enough and without evidence that premium cigars are different as to those specific cancers. They might be better for all mortality, but not as to those specific cancers. We don't think it's— We can take them out of the final regulation. That's just a— That's an ordinary sort of fill-in-gap issue and agency explanations that would not warrant the type of response we got from Judge Mehta here. Your Honor, what Judge Mehta held, I believe, is that the FDA told us what it was doing. It said, we have all these concerns about cigars. We had them in the proposed rule. We gave people an opportunity to come up with premium cigar-specific evidence, and they flubbed that opportunity. They didn't provide us any studies regarding the health risks specific to premium cigars, and we did. We provided a study that they didn't deal with that specifically determined that premium cigars are smoked by those who use them. Ninety-seven percent of them smoke fewer than one per day. That's far away from some of the most serious health consequences. And remember, the proposed rule— What percentage of the adult population smokes premium cigars? I believe the studies say somewhere around 11 percent of the adult population smoke them at all, right? So it's— Smoke any— Any premium cigars, correct. And cigars, more generally, is a little bit higher. Minors are concerned? The evidence in the record is that that number is statistically indistinguishable from zero, right? One-tenth of one percent smoke any cigars. No, smoke any premium cigars. So what the FDA cobbled together this— It's got to be rich kids. Yeah, well, I guess they're out there, right? But the— Quick thing on the remedy, because I don't want to hold you up on time. Well, we have as much time as the court needs. You don't read the district court's order as authorizing retroactive refunds of user fees paid. There's fights about refunds since the date of the vacature order, but we have said that vacature may very well be inappropriate if it's going to take money out of the government's pocket. Or do you read it that way? Well, Judge, Judge may have correctly held that in 2016, the FDA acted illegally when regulating premium cigars. I'm aware of that. I'm trying to get an answer to my question about refunds from the date from prior to 2023, when the rule was vacated. I think that the logical consequence of the vacator ruling is that the regulation of premium cigars was improper from the beginning, and refunds would be potentially appropriate. Has anybody asked for refunds? Not to my knowledge, Your Honor. They sure will now that you've said they can or that you're telling them that's available. Nobody follows my advice all the time. How much money are we talking about if it were to be refunded? Almost nothing, Judge. So if you look at Section 919— I think your government definition of almost nothing and my almost nothing are probably a very different number. Well, no. We have to look in orders of magnitude. So if you look at Section 919— Are we talking millions of dollars? We are talking millions of dollars, but on a relative basis. How many? The evidence in the record is that premium cigar manufacturers are paying $15 to $20 million a year in user fees. That's $712 million as of last year. So annually, the FDA is bringing in— That's not almost nothing in my view. But it is 2.5 percent of the annual user fees. That's a very different thing, but I don't see anywhere in Judge Mehta's vacature analysis, the type of analysis that we would expect and our precedent requires, if a court is entering an order that allows retroactive payments of money out of the U.S. treasurer. Can you point me where he analyzed that aspect? He did not analyze it, and it was not before him. That's exactly right. Okay. That's right. It was not before him. The issue wasn't ripe. It's not a question of ripeness. It's very ripe. If, in fact, that's the effect of his vacature order, it was very ripe. Your Honor, I'm pretty sure, and I may be wrong about this, and I don't want to go too far down this road, but I don't think I could have asked Judge Mehta for a refund. I think that jurisdiction is probably down the street at the Court of Federal Claims if anybody wanted to bring those under the Tucker Act and other revenue-related— I'm not asking whether you can ask him whether his vacature order had that effect, and he did not analyze it as having that effect. He didn't analyze it as sort of a purely prospective vacature. Exactly, and the issue wasn't presented. The issue at that time was what should be the remedy. Should it be vacature or remand without vacature? He was dealing with the payment scheme, and he talked about the user fee scheme. That's right, and he talked about the burden of having—for premiums guards, manufacturers—of effectively having to pay for the regulation of other products. I think this is an important point, Judge. We're in a situation here where the Litigation Council for the FDA is arguing that obviously the FDA, if it had mentioned this study, it would have come out in the same place, but there's a huge divorce here between what Litigation Council is arguing and the FDA policymakers. In a formal rule release—and you can find this at 841—they came out and said, look, we need more information on these patterns of use and the type of information that would be really important. It's outside this record, though. Well, it is, but it isn't because— It is or isn't? It was after the rulemaking record closed, correct? It was after the rulemaking record closed. That's correct, but Judge Millett, opposing counsel is asking this court to kind of supply missing reasoning in the final rule, okay? And I don't think this court should do that at all. I don't think they're doing that at all. If this is just the dispute between you, they think we gave enough reasoning, and you say they didn't, and judges agreed with you. So can I ask, it seems to me that in reviewing what the agency did, we can only look at what was in the record. But can we, when we're looking at whether vacator was appropriate or not, and we're thinking, is the agency going to just do what it did before? That's a factor in whether or not you vacate or not. Can we consider the fact that, well, they've shown that they've had some second thoughts about this. They did go back and start relooking at this data. They ultimately withdrew that. But is that something we can consider in evaluating whether the district court abused its discretion in ordering a vacator? Absolutely, Your Honor. Generally, I don't think applies to the selection of the remedy. And there is this allied signal, this progeny is asking for this predictive judgment. Is the agency just going to spackle all this up and come out with the same result? The record shows that that is absolutely not a foregone conclusion or really very much in the cards. And again, I think that we should proceed on just the final rule record. But if we're going back and trying to supply reasoning for the FDA about what we kind of thought they were thinking, this certainly indicates that the Cori study and that type of data about different patterns of use with regard to frequency is super important to the FDA and may have counseled a different result. It has led to a cascade of consequences. They've designated these products as their lowest priority for enforcement. I think you can look at JA-638. This is in the supplemental appendix. The definition for that lowest category of enforcement that the judge made and adopted, that's right out of the FDA. The FDA came up with that at JA-638. Colleagues, do you have any more questions? All right. It sounds like you have a sentence. Yeah. Just one more. If you look at that same site at JA-638, what the FDA said is that at this point, the data submitted both before and against regulation is insufficient to really make a determination with regard to what we should do with these products. So I don't think that this court should be straining to save the FDA final rule explanation where I don't think the FDA itself is committed to it and they didn't supply the key reasoning, key reasoning that they have identified later, key reasoning that they identified in the proposed rule is important. Thank you very much, Counselor. Thank you, Your Honor. All right. Ms. Powell, we'll give you three minutes. Thank you, Your Honors. If the question is, did FDA overlook key evidence about premium cigar use in particular, there is exactly one piece of evidence that plaintiffs point to that FDA did not expressly provide   cite in the rule for the proposition for which they offer it, which is the Cori study, only about three and a half percent of premium cigar users are smoking on a daily basis. They did cite the Cori study. They did acknowledge that the— But not for the relevant point. Not for that. That statement that they say it needed to be cited for is, again, the sentiment is expressed in the rule more generally, and it appears two sentences before the point that FDA does cite it for in the context of this four-page study. There's no credible suggestion that FDA didn't know about this. This is a study undertaken by an FDA scientist that the agency is citing. And if you look at the broader context, there can be no real question that consideration of that one piece of data, if FDA had spelled out in this final rule, okay, so the precise number we have on hand about just how infrequent this use is, is that only about three and a half percent of these people are smoking daily. This, again, still means that we have well over 100,000 smoking these, you know, cigarette pack-sized products every single day. But isn't it incumbent on the agency then to say, despite the lower use for premium cigars, we still think that it has an impact on health because—and there's nothing like that in here. I think it is abundantly clear that spelling that out more would not have changed the outcome here, and there are many data points supporting that, both with respect to— I'm not saying change the outcome. I'm saying you had to support the outcome with reasoning. Well, but this is subject to a harmless error inquiry. If the error, if there was one, was not prejudicial, then it doesn't get set aside under the plain terms of the APA. But we, of course, don't think that there was error. FDA explained why, notwithstanding infrequent use, there are abundant health harms that warrant regulation, and that's consistent with what it did in the broader rulemaking. So again, this is not the only product where there's a question of lesser risk. You have infrequent use of pipes and hookahs. Those are deemed. Those are uncontroversially deemed. You have e-cigarettes, which are not used less frequently, but may present lesser risk in a significant way, unlike premium cigars. So I know it's not in the record that was before the agency, but it is your lowest priority enforcement, unlike e-cigarettes and hookahs. The document that they're referring to is a specific set of enforcement priorities in the context of the e-cigarette vaping epidemic that was addressing how to target issues of youth use of tobacco products. And so it is true and not inconsistent with anything in the rule that children are not overwhelmingly using these products in the way they use bubblegum-flavored e-cigarettes. Can I just ask you, too, in terms of the question of vape eater, you forfeited the argument that the district court should have considered the fact that industry could ask for refunds of fees already paid, because you never raised that before. Is that correct? I am not aware of either side specifically spelling out the vision for the availability of refunds, but certainly the complexity of this scheme and the echoes of the schemes and allied signal and American Great Lakes, where you are talking about the various ways in which among users, both before and not before the court, you might have to reallocate or untangle or potentially refund. Those are absolutely the types of concerns that were raised and that the government offered as a basis for needing to remand without vape eater. You put these two things together. It is clear that FDA would have reached the same conclusion if it had considered that one item from the Cori study. This is not failure to consider an entire aspect of the question. It is a minor explanatory point. And if I can point you to page 18 of our brief. I don't want to belabor this, but didn't the agency thereafter say, we are reconsidering this? I know you withdrew it, but based on information like in the Cori study? That's exactly what I wanted to talk about. Page 18 of our reply brief, we talk about what happens after the ANPRM. In the advance notice itself, the characterization that plaintiffs offer is not correct. FDA did not say, oh, there's a new Cori study with the same data. We didn't realize this was there before, and it's very important. It cited that study as an example of a study published after the deeming rule was promulgated as new evidence in the sense of subsequently published. That's the extent of what it said about that Cori study. But it says here in 2021 in withdrawing the notice from the unified agenda. Even if there is significant occasional use of premium cigars, some premium cigar smokers have frequent use with significant exposure to harmful constituents that are known to increase the risk of oral, esophageal, laryngeal, and lung cancer, among other negative health consequences. Dual use of premium cigars with other tobacco products is also a significant concern. And that the evidence before the agency at that point, which is really not different from the evidence before the agency in the final rule, supports regulation. Everything points to the fact that the agency, if required to explain more and to address this Cori finding more specifically, would reach the same conclusion. And again, considering it in the broader deeming context, the importance of this threshold decision to whether these products are subject to federal regulation under the scheme at all, and the way it's treated, e-cigarettes and pipes and hookahs, this is a basic public health question that FDA amply answered describing the various and interrelated harms of using this category in this particular subcategory of tobacco products. Thank you very much, counsel. The case is submitted.
judges: Millett; Pan; Randolph